# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                       No. CR 08-2936 JB

JAMES GRIEGO,

       Defendant.

## UNSEALED MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before the Court on: (i) the Parties' *Sealed* Joint Objections to the Presentence Report, filed April 26, 2012 (Doc. 510)("Objections"); and (ii) the Brief Supporting Objections to the Presentence Report, filed September 12, 2012 (Doc. 550)("Brief"). The Court held a sentencing hearing on October 16, 2012. The primary issues are: (i) whether the Court should sustain the parties' objection to the factual findings in the Presentence Investigation Report ("PSR") (disclosed Mar. 22, 2011), that Defendant James Griego is responsible for the 19.278 kilograms of methamphetamine attributed to him in paragraph 68 of the PSR, rather than the 140.22 grams of methamphetamine that the parties contend is attributable to Griego based on the evidence of telephone calls in which he was involved; (ii) whether the Court should sustain the parties' objection to the PSR's application of a 2-level enhancement pursuant to § 2D1.1(b)(1), where the weapons were found in a vehicle on the property, no drugs or drug paraphernalia were found in the vehicle, and the evidence establishes

---

[1] In its Sealed Memorandum Opinion and Order, filed February 19, 2013 (Doc. 573)("Sealed MOO"), the Court inquired whether the parties had any proposed redactions to protect confidential information within the Sealed MOO before the Court published a public version of the Sealed MOO. See Sealed MOO at 1 n.1. The Court gave the parties ten calendar days to provide notice of any proposed redactions. See Sealed MOO at 1 n.1. The Court is now re-filing the Sealed MOO in an unsealed form.

the firearms were placed in the car by a co-Defendant; and (iii) whether Griego is a minimal/minor participant in the drug trafficking conspiracy for which he was convicted. The Court will sustain the parties' objections to the USPO's calculated offense level. Because the evidence of telephone calls involving Griego, disclosed after the USPO disclosed the PSR, supports, by a preponderance of the evidence, the parties' stipulation that Griego's involvement in the conspiracy makes him responsible for only 140.22 grams of methamphetamine, the Court will sustain the parties' first objection. Because the firearms for which the USPO applied the U.S.S.G. § 2D1.1(b)(1) 2-level enhancement were found in a Ford Bronco on Griego's property, and drugs were found in Griego's home, and because the firearms were placed in the Bronco with Griego's knowledge by the leader of the drug trafficking conspiracy, the preponderance of the evidence establishes that the firearms were possessed by Griego as that term is construed pursuant to U.S.S.G. § 2D1.1(b)(1). Because the evidence shows that Griego's co-Defendant, Javier Aispuro, stowed the firearms in the Bronco so that Griego would accompany him to engage in activity unrelated to the drug trafficking conspiracy, and because the firearms were recovered by officers from the Bronco where Aispuro stored them, Griego has proven it is clearly improbable that he possessed them in connection with the offense. Because Griego has not provided an explanation how Aispuro's possession of the firearms was legitimate and unrelated to the drug trafficking conspiracy, however, he has not met his burden to prove that it is clearly improbable any possession by him of the firearms found in the Bronco was in connection with the offense. The Court thus finds that 2-level enhancement under U.S.S.G. § 2D1.1(d)(2) was proper, and that the firearms found in the Bronco were possessed in connection with the offense for which Griego was convicted. The Court therefore overrules the parties'

objection to the PSR's application of U.S.S.G. § 2D1.1(b)(1)'s 2-level enhancement.  Finally, based on the United States' representations and the PSR's factual findings, the Court finds that Griego's role in the drug trafficking conspiracy was somewhere in between that of a minor and a minimal participant in the conspiracy.

## FACTUAL BACKGROUND

Griego was arrested on December 19, 2008, for his involvement in a drug trafficking conspiracy, referred to throughout the case as the Aispuro Drug Trafficking Organization ("Aispuro DTO").  See PSR ¶ 13, 45, at 4, 12.  The Aispuro DTO conspiracy began in or about June, 2008, and continued until December, 2008, with search warrants being executed on the Aispuro DTO on or about December 17, 2008.  See PSR ¶ 13, at 4.  The Aispuro DTO distributed anywhere from twenty to fifty pounds of methamphetamine per week during the six-month investigation into the conspiracy.  See PSR ¶ 17, at 6.  The gross sales of the amount of drugs that the Aispuro DTO distributed during the six-month investigation, based on the estimated price of methamphetamine at the time, is estimated to be between $6,240,000.00 and $14,400,000.00, or more.  See PSR ¶ 17, at 6.  In addition to trafficking in drugs, Aispuro bought firearms that he would ship to associates in Mexico.  See PSR ¶ 15, 16, at 5.

The leader/organizer of the drug trafficking conspiracy was Griego's co-Defendant, Javier Aispuro.  See id. ¶ 23, at 7.  Based on the investigation, Aispuro was identified as one of the largest methamphetamine suppliers in the Albuquerque, New Mexico, area.  See PSR ¶ 16, at 5.  The first wire-tapped recorded conversation between Griego and Aispuro was on July 26, 2008.  See PSR ¶ 43, at 11.  Between July 26, 2008, and November 2, 2008, Griego and Aispuro communicated by telephone approximately forty-three times.  See PSR ¶ 43-44, at 11-12.

Griego first met Aispuro sometime around late 2006, in a car audio installation shop.  See (Sealed) Plea Agreement ¶ 7, at 3, filed Aug. 26, 2009 (Doc. 181)("Plea Agreement"); PSR ¶ 66, at 16.  Griego installed stereos and other electronic equipment on Aispuro's vehicles in exchange for methamphetamine.  See Plea Agreement ¶ 7, at 3; PSR ¶ 66, at 16.  In June 2008, Griego went to work at "a car audio equipment and detailing shop" that Aispuro opened with co-Defendant Adam Anderson.  See Plea Agreement ¶ 7, at 4; PSR ¶ 66, at 16.  Anderson owned two businesses, including the car audio equipment and detailing shop, that, although both legitimate businesses, were also fronts for the Aispuro DTO to traffic in methamphetamine and launder money.  See PSR ¶¶ 34, 44, at 9, 11.

At the time of Griego's arrest, officers searched his property, and found very small amounts of methamphetamine, cocaine, and marijuana inside his home, the amount of which was not reported.  See PSR ¶ 45, at 12.  The officers also searched a Ford Bronco on Griego's property, finding the following firearms and ammunition inside: an SKS 7.62 Rifle, serial number C21000629; an SKS 7.62 Rifle, serial number 11607730; an XM15-E2S Rifle, serial number L246847; four magazine clips; a mini Fire Storm handgun, serial number 546163; 55 .223 Rifle rounds; and Point Blank body armor.  See id.  The Bronco in which the firearms were found was not Griego's, but was on the property before Griego began renting it, and he believes that the owner of the property's relative owned the Bronco.  See Brief at 4.

## PROCEDURAL BACKGROUND

Griego, pursuant to the Plea Agreement, filed Aug. 26, 2009 (Doc. 181), pled guilty to the Indictment, filed Dec. 16, 2008 (Doc. 2), charging him in Count I with Conspiracy, to wit: Distribution of 500 grams and more of a mixture and substance containing a detectable amount

of methamphetamine, a violation of 21 U.S.C. § 846, 21 U.S.C. §§ 841(a)(1) and (b)(1)(A).

Both Griego and the United States agree that "the Defendant [will] not [] seek a downward

departure or variance from the applicable sentencing guideline range as determined by the Court

after the Court resolves any objections by either party to the presentence report."   Plea

Agreement ¶ 9(b), at 5.   He agrees to waive his right to appeal his "conviction(s) and any

sentence at or under the maximum statutory penalty authorized by law."   Plea Agreement ¶ 18, at

8.    Notably, the parties did not stipulate in the Plea Agreement to an amount of

methamphetamine for which Griego is responsible or whether Griego possessed any weapons in

the course of the conspiracy, including the three assault rifles left in the abandoned car on his

property.

The USPO disclosed its PSR for Griego on March 22, 2011.  See PSR at 2.  In the PSR,

the USPO notes that, based on "19.278 kilograms of methamphetamine for which Griego is

accountable under Relevant Conduct," pursuant to U.S.S.G. § 2D1.1(c)(1), the base offense level

is 38.  PSR ¶ 68, at 17.  The USPO, however, pursuant to U.S.S.G. § 2D1.1(a)(5)(iii), calculates

Griego's base offense level to be 34, based on its finding that Griego had a minor/minimal role in

the offense.  See id.  The PSR applies a 2-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(1),

noting that, when Griego was arrested and his property was searched, officers located three

rifles, a handgun, four magazine clips, and fifty-five rifle rounds.  See PSR ¶ 69, at 17.  The PSR

applies a 3-level reduction in Griego's offense level pursuant to U.S.S.G. § 3B1.2, based on

Griego's role:

> Griego's role was mitigating when compared to the seven co-defendants in this
> case and due to the small amount of drugs located at the defendant's residence at
> the time of his arrest.  He has been identified as an individual who received
> methamphetamine directly from Aispuro and Anderson, and it appears he sold the
> drugs on behalf of the DTO.  He worked at Amazing Audio and Detail with

> Anderson and was one of the few people to have contact directly with Aispuro.
> Additionally, Griego is responsible for the three rifles, one handgun, numerous
> rounds of ammunition and the body armor located in his residence at the time of
> his arrest.  Within the DTO, Griego's role was less culpable than most; therefore,
> he is identified as a minor/minimal participant within the organization.  Based
> upon this information, a three level reduction will be applied.

PSR ¶ 72, at 18.  With a 3-level reduction for acceptance of responsibility, the PSR calculates

Griego's total offense level to be 30.  See PSR ¶ 30, at 18.  An offense level of 30 and a criminal

history category of II provides a guidelines sentencing range of 108 to 135 months.

On April 26, 2012, the Parties filed the Objections to the PSR.  The parties object to the

offense level that the USPO calculated for Griego based on 19.278 kilograms of

methamphetamine, asserting: "Further review of the evidence since the PSR was prepared has

led both parties to conclude that Mr. Griego was accountable for at least 132, but no more than

200 grams of methamphetamine."  Objections at 1.

The Court scheduled a sentencing hearing on this matter for May 22, 2012.  Upon reviewing

the briefing for the hearing, including the parties' Objections, the Court discovered that the parties

had failed to provide the Objections to the USPO.  In a Memorandum Opinion and Order, filed May

21, 2012 (Doc. 521)("May 21, 2012 MOO), the Court stated that the parties "ha[ve] hindered the

USPO from preparing a formal addendum, responding to the objections, and advising the Court on

how to deal with the objections."  May 21, 2012 MOO at 1.  The Court thus continued the hearing

and ordered

> the parties to provide the objections to the USPO.  The USPO will prepare a
> formal addendum.  If the parties still object, they must thoroughly brief their
> objections for the Court, fully and specifically advising the Court why their
> review of the evidence reaches a different result from what the USPO concludes.
> All evidence and arguments in support of their objections must be provided to the
> Court before the hearing.

May 21, 2012 MOO at 1.

In a Memorandum Opinion and Order, filed June 21, 2012 (Doc. 534)("June 21, 2012 MOO"), after the USPO disclosed its second addendum to the PSR, the Court stated that "the parties still object to the Presentence Investigation Report, disclosed March 22, 2011, and to the Second Addendum." June 21, 2012 MOO at 1. The Court noted that the parties failed to comply with the Court's instructions in its May 21, 2012 MOO to "thoroughly brief their objections to the Court." June 21, 2012 MOO at 1. The Court provided the parties the opportunity to comply with the Court's instructions if they still objected to the USPO's calculations:

> Again, if the parties still object, they must thoroughly brief their objections for the Court, fully and specifically advising the Court why their review of the evidence reaches a different result from what the USPO concludes. All evidence and arguments in support of their objections must be provided to the Court before the hearing. They also need to provide their objections, and evidence, and arguments to the USPO.

June 21, 2012 MOO at 1.

On September 12, 2012, pursuant to the Court's direction in the June 21, 2012 MOO, the United States filed its Brief. See Doc. 550. The United States asserts that the parties' agreement that Griego is accountable for at least 132, but no more than 200 grams of methamphetamine, stems from the parties' calculations based on the evidence of telephone conversations in which Griego was involved, collected during the investigation of the drug-trafficking scheme underlying this case. See Brief at 1-2. The United States noted that, working with the Federal Bureau of Investigation's case agent, it was able to identify fifty-eight calls "involving . . . Griego," with a total of twenty-five between Griego and Aispuro. Brief at 1. The United States attached to its brief the fifty-eight pertinent telephone calls in which Griego was involved. See Detailed Linesheet, filed Sept. 12, 2012 (Doc. 550-1). Based on these calls and the Relevant

Conduct relating to Griego, as noted in paragraphs 43 and 66 of the PSR, the United States asserts:

> The above evidence establishes Mr. Griego's responsibility for 140.22 grams of methamphetamine. . . . As the PSR notes, Griego was a minor/minimal participant in the activities of the Aispuro drug trafficking organization. His very limited participation in the conspiracy demonstrates that the 19.278 kilograms of methamphetamine attributed to Mr. Griego was not a "reasonably foreseeable" amount within the meaning of U.S.S.G. § 2D1.1(c)(7).

Brief at 4. The United States states that, should the court accept the parties' joint objections to the amount attributed to Griego, his base offense level is reduced from 34 to 26. See Brief at 4.

In regards to the parties' objections to the USPO's conclusion that the firearms found on Griego's property should be attributed to him, the United States asserts that the weapons were found inside of a broken-down Ford Bronco on the property that Griego was renting with his wife, and he believes that the Bronco belonged to a relative of the owner of the residence. See Brief at 4. The United States argues that the weapons are not attributable to Griego, and the Court should not apply the 2-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(1), because Griego "had, in fact, taken steps to avoid any contact with, or be in the presence of, those weapons." Brief at 5. The United States explains:

> Approximately two weeks before the December 19, 2008, search by government agents that located the weapons, Javier Aispuro had come to Mr. Griego's home to pick him up and drive him to Socorro, New Mexico, to work on a car alarm. When Mr. Aispuro arrived at Griego's home, Griego saw the weapons in Aispuro's Chevrolet Tahoe, and refused to be in the vehicle with those weapons. Mr. Aispuro, therefore, took them out of his own vehicle and stashed them in the Bronco, with the understanding that he would retrieve them when he brought Griego back to his home. Later, when Aispuro dropped Griego off, neither man remembered the weapons, and Aispuro did not take them. Griego subsequently told Aispuro that he needed to get the weapons out of the Bronco. Aispuro agreed to do this, but had not done so before they were located by agents.

Brief at 4-5.  The United States asserts that, should the Court sustain the parties' objections to the PSR, "the parties agree that the proper Guideline provisions applicable to Mr. Griego are an offense level of 20, and a criminal history of category II."  Brief at 5.  An offense level of 20 and a criminal history category provides a guidelines sentencing range of 37 to 46 months.

On September 13, 2012, the USPO disclosed its Third Addendum to the Presentence Report ("Third Addendum").  The USPO states: "Based upon this new information which was previously not made available in discovery, the [USPO] can establish a quantitative amount of methamphetamine attributable to the defendant through his direct conduct."  Third Addendum at 1-2.  The USPO notes that, although not necessarily all inclusive, "it is what is best known, as to Griego's factual involvement . . . . Therefore, the [USPO] concurs that Griego's base offense level should be reduced to an offense level 26."  Third Addendum at 2.  The USPO stands by its position in the PSR in regard to the parties' objection to the USPO attributing the firearms to Griego.  The USPO notes that "a defendant is accountable for the conduct (acts or omissions) of others that was both: (a) in furtherance of the jointly undertaken criminal activity; and (b) reasonably foreseeable in connection with that criminal activity."  Third Addendum at 2 (citing U.S.S.G. § 1B1.3, cmt. n.2).  The USPO argues that, given the overall size of the Aispuro DTO and the large amount of methamphetamine that they distributed, "it is reasonably foreseeable that Aispuro and or any one of the defendant's [sic] involved in the criminal enterprise would possess firearms in furtherance of the criminal activity."  Third Addendum at 3.  The USPO asserts that, although Griego contends that he took steps to affirmatively avoid possessing the firearms, "Griego is accountable for the firearms even if he himself had not agreed to [the] conduct, as the possession of firearms was reasonably foreseeable in connection with the criminal activity."  Third Addendum at 2.  The USPO notes that Application Note 3 -- Application Note 11 in the

-9-

2012 edition of the <u>Guidelines Manual</u> -- to U.S.S.G. § 2D1.1 provides that the 2-level enhancement should not be applied where it is "'clearly improbable' that the weapon was not connected with the offense."  Third Addendum at 3 (quoting U.S.S.G. § 2D1.1, cmt. n.3 (2011)).  The USPO contends, however:

> [I]t is highly probable these firearms were possessed in connection with the drug trafficking activities during the course of conduct for which Griego is accountable.  The firearms were located within [the] vehicle on Griego's property, an area where he had direct access and control over.  Griego knew the firearms were present in the vehicle, and constructively had possession of them in the course of other jointly undertaken criminal activity.

Third Addendum at 3.  The USPO concludes, therefore, that the Court should find Griego's total offense level to be 22, and his criminal history to be II.  <u>See</u> Third Addendum at 3.

At the hearing, the parties agreed that they continued to support both of their objections to the PSR and agreed that the two objections are the only objections to the PSR.  <u>See</u> Transcript of Hearing at 3:2-6 (Court, Hannum)(taken Oct. 16, 2012)("Tr.").[2]  Griego stated that both he and the United States stipulate to his being responsible for 140.22 grams of methamphetamine.  <u>See</u> Tr. at 3:14-15 (Hannum).  In response to the Court's inquiry whether that amount is different from the amount to which the parties stipulated in the Plea Agreement, the United States stated that there was no stipulation to an amount in the Plea Agreement, which, in retrospect, the United States believes likely led to the confusion.  <u>See</u> Tr. at 3:23-4:4 (Court, Meyers).  The Court then asked whether, in light of the parties' new stipulation, Griego objects to the Third Addendum's concurrence with the Court sustaining the parties' objection to the PSR.  <u>See</u> Tr. at 4:5-8 (Court).  Griego responded that he does not object to that aspect of the Third Addendum.  <u>See</u> Tr. at 4:9 (Hannum).  In support of his objection to the USPO attributing the firearms to him,

_____

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcripts may contain slightly different page and/or line numbers

Griego asserted that the firearms are not attributable to him, as he affirmatively withdrew from that aspect of the Relevant Conduct: "[W]hile I'm cognizant of the notion that [there is] joint liability for . . . anything that's reasonably foreseeable within the conspiracy, . . . it's clear that Mr. Griego took affirmative steps to not participate in that particular aspect of the criminal conduct . . . ." Tr. at 5:5-10 (Hannum).

The United States asserted that Griego's contention with regard to whether the firearms should be attributed to him "is []consistent with what the Government would be able to prove." Tr. at 5:16-17 (Meyers). The United States also noted that the information collected during the investigation is consistent with Aispuro, not Griego, owning the firearms. See Tr. at 5:18-20 (Meyers). The United States stated that, while the USPO's position is not incorrect or unwarranted, it believes that not applying the two-point enhancement under U.S.S.G. § 2D1.1(b)(1) is more consistent with the facts and circumstances of this case as they relate to Griego. See Tr. at 6:7-13. Upon the Court's inquiry, the USPO stated that it stands by its analysis in the Third Addendum, does not have anything to add, and agrees with the parties' stipulation that Griego was a minor/minimal participant in the criminal activity. See Tr. at 6:17-7:4 (Watts, Court).

## RELEVANT LAW REGARDING U.S.S.G. § 2D1.1(a)(5)

Section 2D1.1(a)(5) directs a district court to apply the greatest "offense level specified in the Drug Quantity Table set forth in subsection (c) . . . ." U.S.S.G. § 2D1.1(a)(5). Application Note 5 to § 2D1.1 provides:

> Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance. . . . If the offense involved both a substantive drug offense and an attempt or conspiracy (e.g., sale of five grams of heroin and an attempt to sell an additional

ten grams of heroin), the total quantity involved shall be aggregated to determine the scale of the offense.

U.S.S.G. § 2D1.1, cmt. n.5.   Application Note 7 provides that "[w]here there are multiple transactions . . . the quantities of drugs are to be added."   U.S.S.G. § 2D1.1, cmt. n.7.   Accord United States v. Carlos, No. CR 09-2806 JB, 2012 WL 1378516, at *5 (D.N.M. Apr. 9, 2012)(Browning, J.)("When calculating drug quantities, '[u]nless otherwise specified,' courts look at 'the entire weight of any mixture or substance containing a detectable amount of the controlled substance.'")(quoting U.S.S.G. § 2D1.1, cmt. n.A).   The United States Court of Appeals for the Tenth Circuit has held, however, that because a defendant is involved in a drug trafficking conspiracy does not mean that he may be sentenced based upon the amount of drugs distributed by the conspiracy; rather, the defendant may be sentenced only on the amount of drugs that fell within the scope of the particular defendant's agreement with the conspirators.

See United States v. Roberts, 14 F.3d 502, 522 (10th Cir. 1993).  The Tenth Circuit Stated:

> Quantity is not an element of a conspiracy offense. Moreover, a conspiracy conviction under [21 U.S.C.] § 846 does not establish beyond a reasonable doubt that a defendant conspired with every other person charged in the indictment. Rather, a conspiracy conviction simply means that he agreed with at least one other person to violate the drug laws. The drug amount attributable to a defendant for purposes of sentencing is not established merely by looking to the amount of drugs involved in the conspiracy as a whole.  Under the Guidelines each conspirator, for sentencing purposes, is to be judged not on the distribution made by the entire conspiracy but on the basis of the quantity of drugs which he reasonably foresaw or which fell within the scope of his particular agreement with the conspirators.

United States v. Roberts, 14 F.3d at 522 (quoting United States v. Castaneda, 9 F.3d 761, 769-70 (9th Cir. 1993))(internal alterations, quotations, and emphasis omitted). "The quantum of proof necessary to support a drug quantity determination is a preponderance of the evidence. In carrying its burden, the government is not limited in its proof to only those drugs the defendant

personally handled or with which he was personally involved." United States v. Ruiz-Castro, 92 F.3d 1519, 1534 (10th Cir. 1996), overruled on other grounds, United States v. Flowers, 464 F.3d 1127 (10th Cir. 2006).

In United States v. Carlos, No. CR 09-2806 JB, 2012 WL 1378516 (D.N.M. Apr. 9, 2012)(Browning, J.), where the United States found two identical duffle bags on a train containing equal amounts of drugs, although the defendant's finger prints were found on the drug packages inside of only one duffle bag, the Court concluded that "there is no sound basis to distinguish the two black leather duffle bags in the train that would justify attributing the drugs in only one of the bags to [the defendant] as opposed to the drugs in both bags." 2012 WL 1378516, at *5. The Court noted that, while the defendant admitted to carrying only one bag onto the train, "[t]he question is whether he knew or should have known that . . . the 9.986 kilograms as opposed to the 4.933 kilograms [was involved in the offense]." 2012 WL 1378516, at *5. Because the defendant admitted that he saw his co-conspirator purchase both the bags, and because he was travelling with his co-conspirator, and because he carried one of the bags which contained the cocaine, the Court attributed the full amount to the defendant, concluding that the defendant "reasonably should have known that both bags contained narcotics." 20120 WL 1378516, at *5.

## LAW REGARDING U.S.S.G. § 2D1.1(b)(1)

Section 2D1.1(b)(1) of the Sentencing Guidelines provides: "If a dangerous weapon (including a firearm) was possessed, increase [the base offense level] by **2** levels." U.S.S.G. § 2D1.1(b)(1). "The enhancement for weapon possession in subsection (b)(1) reflects the increased danger of violence when drug traffickers possess weapons." U.S.S.G. § 2D1.1, cmt.

n.11(A).  The Tenth Circuit has "frequently noted that firearms are 'tools of the trade' for drug

traffickers."  United States v. Lizardo-Figueroa, 277 F. App'x 778, 781 (10th Cir. 2008)[3](quoting

United States v. Martinez, 938 F.2d 1078, 1083 (10th Cir. 1991)).

      **1.**        **Whether the Defendant Possessed the Dangerous Weapon.**

      The enhancement is expressed in the passive voice, and Application Note 11 to the

Guidelines specifies that "[t]he adjustment should be applied if the weapon was present, unless it

is clearly improbable that the weapon was connected with the offense."  U.S.S.G. § 2D1.1, cmt.

n.11(A).  See United States v. Hernandez-Mejia, No. CR 05-469 JB, 2008 WL 5978897, at **6-7

(D.N.M. Nov. 19, 2008)(Browning, J.).[4]  The Federal Sentencing Guidelines Handbook notes:

"That the gun was possessed for a reason other than facilitating a drug offense does not preclude

the enhancement."  Roger W. Haines, Frank O. Bowman, III & Jennifer C. Woll, Federal

Sentencing Guidelines Handbook § 2D1.1, at 546 (2012-2013 ed.)(citing United States v.

Corcimiglia, 967 F.2d 724 (1st Cir. 1992)(guns purchased for home security); United States v.

---

     [3]United States v. Lizardo-Figueroa is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored . . . .  However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision."  United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that United States v. Lizardo-Figueroa and United States v. Moreira, 317 F. App'x 745 (10th Cir. 2008)(unpublished), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this memorandum opinion and order.

     [4]United States v. Hernandez-Mejia, and much of the case law analyzing U.S.S.G. § 2D1.1(b)(1), references Application Note 3, rather than Application Note 11, for the Guidelines Committee's commentary on § 2D1.1(b)(1).  Section 2D1.1's Application Notes were amended in the 2012 edition of the Guidelines Manual, and what was Application Note 3 has now been moved, word-for-word, to Application Note 11.  See U.S. Sentencing Comm'n, Guidelines Manual § 2D1.1, cmt. n.11, at 158-159 (2012 ed.), compare U.S. Sentencing Comm'n, Guidelines Manual § 2D1.1, cmt. n.3, at 154 (2011 ed.).

Almonte, 952 F.2d 20 (1st Cir. 1991)(the defendant's claim that the gun was kept in store because of past robberies actually hurt defendant, for it established knowledge that the gun was present); United States v. Webster, 960 F2d 1301 (5th Cir. 1992)(affirming enhancement notwithstanding evidence that defendant held weapon as collateral for a loan)).  In United States v. Zavalza-Rodriguez, 379 F.3d 1182 (10th Cir. 2004), the Tenth Circuit contrasted the U.S. Sentencing Commission's use of the passive voice "was possessed" in § 2D1.1(b)(1), with its use of the active voice in § 5C1.2(a)(2) -- mandating that possession be in "connection with the offense," U.S.S.G. § 5C1.2(a)(2) -- to make clear that application of § 2D1.1(b)(1)'s 2-level enhancement does not require evidence that the dangerous weapon was used in connection with the offense, only that it "was possessed."  379 F.3d at 1186-1187.  The Tenth Circuit noted:

> "[P]ossessed" is used in two different senses in the two different provisions. Section 2D1.1(b)(1) is written in the passive voice, requiring a sentence enhancement "[i]f a dangerous weapon (including a firearm) was possessed." For purposes of § 2D1.1(b)(1), the government need only show that "the weapon was found in the same location where drugs or drug paraphernalia are stored." United States v. Roederer, 11 F.3d 973, 982-83 (10th Cir. 1993)(quotation omitted). Possession in the context of § 2D1.1(b)(1) is therefore possession by proximity-constructive possession.
>
> By contrast, § 5C1.2(a)(2) is written in the active voice, mandating that possession be in "connection with the offense." . . .  [P]ossession in § 5C1.2(a)(2) is an active possession whereby there is a close connection linking the individual defendant, the weapon and the offense. In re Sealed Case [(Sentencing Guidelines' "Safety Valve"), 105 F.3d [1460,] 1463 [(D.C.Cir.1997)]. As we noted in Roederer, § 2D1.1 was amended in 1991 to require only that the weapon "was possessed," eliminating the more specific language requiring the weapon to be carried "during the commission of the offense." Roederer, 11 F.3d at 982-83. The new rendering of § 2D1.1(b)(1) broadens the scope of culpable conduct beyond that covered by the old language, which, importantly, now distinguishes it from the language of § 5C1.2(a)(2) ("possess ... in connection with the offense"). Thus, the distinctions between the language of § 2D1.1(b)(1), requiring mere proximity to the weapon, and § 5C1.2(a)(2), requiring active possession, make clear that a closer degree of connection is necessary to preclude application of the safety valve than is necessary for a finding of possession under § 2D1.1(b)(1).

-15-

United States v. Zavalza-Rodriguez, 379 F.3d 1182, 1186-87 (10th Cir. 2004)(citing In re Sealed Case (Sentencing Guidelines' "Safety Valve"), 105 F.3d 1460, 1462-63 (D.C.Cir.1997)).

The Tenth Circuit has held that, for the 2-level enhancement to apply, "[t]he government must show by a preponderance of the evidence that 'a temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant . . . .'" United States v. Sallis, 533 F.3d 1218, 1225 (10th Cir. 2008)(quoting United States v. Pompey, 264 F.3d 1176, 1180 (10th Cir. 2001))(internal quotation omitted). See United States v. Beltran, 571 F.3d 1013, 1021 (10th Cir. 2009)("To satisfy its burden for application of a two level enhancement under USSG § 2D1.1(b)(1), the government must show a temporal proximity between a weapon, the drug trafficking activity, and a defendant."); United States v. Hernandez-Mejia, 2008 WL 5978897, at **6-7 (Browning, J.)("[F]or the 2–level enhancement to apply, the government must show by a preponderance of the evidence that a temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant.")(internal quotations omitted). "'[T]he government need only show that the weapon was found in the same location where drugs or drug paraphernalia are stored," United States v. Zavalza-Rodriguez, 379 F.3d at 1186-87, or "that the weapon was located nearby the general location where drugs or drug paraphernalia are stored or where part of the transaction occurred," United States v. Flores, 149 F.3d 1272, 1280 (10th Cir. 1998)(quotation omitted). See United States v. Hall, 473 F.3d 1295, 1312 (10th Cir. 2007)(upholding enhancement where "shotgun was found in a car sitting right outside [defendant's] residence and easily accessible through the top of the vehicle . . . [and] other drug paraphernalia was found at the house, including scales with cocaine residue on them."); United States v. Humphrey, 208 F.3d 1190, 1211 (10th Cir. 2000)(upholding enhancement when gun

found in trunk of defendant's Dodge, miles from the location of the defendant's arrest, and "no drugs were found in the trunk of the Dodge, [but] other items connected with the conspiracy were, including [] drug ledgers," and car was connected to an earlier drug-buying trip), abrogated in part on other grounds, Arizona v. Gant, 556 U.S. 332 (2009); United States v. Hernandez-Mejia, 2008 WL 5978897, at *9 (concluding that 2-level enhancement applied where a gun was found on the floor in the defendant's house, which "trial evidence indicated . . . was the center of the financial activity underpinning the conspiracy").

> **2.      Application of U.S.S.G. § 2D1.1(b)(1) in the Context of a Drug Trafficking Conspiracy.**

The Tenth Circuit has noted that "in the case of jointly undertaken criminal activity . . . the district court must consider all reasonably foreseeable acts of others in furtherance of the criminal activity when applying sentencing enhancements." United States v. Moreira, 317 F. App'x 745, 748 (10th Cir. 2008)(unpublished)(citing U.S.S.G. § 1B1.3(a)(1)(B)).   This conclusion stems from the Guidelines definition of Relevant Conduct provided in U.S.S.G. § 1B1.3(a)(1)(B).   Under § 1B1.3(a)(1)(B), for purposes of sentencing a defendant, the defendant is responsible not for all conduct of the defendant's co-conspirators, but rather for: (i) all reasonably foreseeable conduct; (ii) of others; (iii) taken in furtherance of; (iv) the jointly undertaken activity for which the defendant was convicted.   See U.S.S.G. § 1B1.3(a)(1)(B). "Thus, a sentencing court must 'attribute to a defendant weapons possessed by his co-defendants if the possession of weapons was known to the defendant or reasonably foreseeable by him.'" United States v. Moreira, 317 F. App'x at 748 (quoting United States v. McFarlane, 933 F.2d 898, 899 (10th Cir. 1991)).   See United States v. Foy, 641 F.3d 455, 470 (10th Cir. 2011) ("The enhancement applies when a co-defendant possessed a firearm, so long as possession was

reasonably foreseeable to the defendant.")(citing United States v. Underwood, 938 F.2d 1086, 1090 (10th Cir. 1991)); United States v. Goddard, 929 F.2d 546, 548 (10th Cir. 1991)(noting that the 2-level enhancement pursuant to § 2D1.1(b)(1) "may be based on the conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant"); United States v. Goree, No. CR 11-0285 JB, 2011 WL 5223028, at *10 (D.N.M. Oct. 20, 2011)(Browning, J.)("[A] sentencing court may 'attribute to a defendant weapons possessed by his codefendants if the possession of weapons was known to the defendant or reasonably foreseeable by him.'")(quoting United States v. Smith, 131 F.3d 1392, 1400 (10th Cir. 1997)).

Where a defendant was convicted of conspiracy to traffic drugs, the Tenth Circuit stated that, "the straightforward application of the Guidelines provision authorizes the increase in offense level even if the gun was actually possessed only by [a co-conspirator] . . . ." United States v. Humphrey, 208 F.3d at 1210. In the context of drug trafficking conspiracies, the United States Court of Appeals for the Fifth Circuit has stated that "[o]rdinarily, one co-conspirator's use of a firearm will be foreseeable because firearms are 'tools of the trade' in drug conspiracies." United States v. Morgerson, 4 F.3d 337, 350 (5th Cir. 1993)(quoting United States v. Aguilera-Zapata, 901 F.2d 1209, 1215-16 (5th Cir. 1990)). See United States v. Lopez, 384 F.3d 937, 944 (8th Cir. 2004)("Under the Guidelines, a two-level firearm enhancement can only be applied if the Government shows that the defendant knew or should have known based on specific past experiences with the co-conspirator that the co-conspirator possessed a gun and used it during drug deals.")(citing United States v. Highsmith, 268 F.3d 1141, 1142 (9th Cir. 2001)). The United States Court of Appeals for the Sixth Circuit has held that whether a co-

conspirator's possession of firearms is reasonably foreseeable to the defendant depends on the amount of drugs in proximity to the firearms:

> [W]e have declined to find clear error in a district court's conclusion that possession of a firearm was reasonably foreseeable when there are massive amounts of drugs in a single location . . . . When there are not 'huge quantities' of narcotics near the weapon, we have insisted upon additional evidence that defendant expected a firearm to be present.

United States v. Woods, 604 F.3d 286, 291(6th Cir. 2010).

### 3.   Whether it is Clearly Improbable that the Weapon was Connected with the Offense.

After the United States has met its burden under U.S.S.G. § 2D1.1(b)(1) to prove that a dangerous weapon was possessed, "the burden shifts to the defendant, who must demonstrate that this connection is clearly improbable." United States v. Sallis, 533 F.3d at 1225 (quotation omitted). See United States v. Humphrey, 208 F.3d at 1210 ("After the government has met [its] burden, a defendant can still avoid the enhancement if [the defendant] can prove that it is clearly improbable that the weapon was connected to the offense.").  "[I]n a drug conspiracy conviction, the § 2D1.1(b)(1) adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the conspiracy offense." United States v. Goddard, 929 F.2d at 548 (internal alterations omitted).

In United States v. Hernandez-Mejia, the Court noted that the defendant admitted "that the United States ha[d] met its initial burden of establishing a nexus" between the weapon, drug trafficking activity, and the defendant where a gun was found in his house when the defendant was arrested.  2008 WL 5978897, at *9.  The defendant contended that he had established that it was clearly improbable that the possession of that firearm was not connected to his conspiracy to distribute drugs, because the gun was found when he was arrested in March, 2005, but the illicit

-19-

activity of the conspiracy took place only from September to December 2004.  See 2008 WL 5978897, at *10.  The Court concluded, however, that the evidence supported finding that the defendant was still engaged in an ongoing conspiracy at the time of his arrest in 2005, because the jury found him guilty of a conspiracy that was ongoing from October 2003, until on or about March 17, 2005, and because a search of one of his co-conspirator's business on March 17, 2005, revealed thirteen ounces of heroin.  See 2008 WL 5978897, at *10.  Additionally, where the defendant also contended that the § 2D1.1(b)(1) enhancement could not be applied to him as there is no evidence that he was an "enforcer" or otherwise "brandished a weapon" in connection with the conspiracy, the Court disagreed, concluding that the "enhancement does not require a defendant to have used [the] dangerous weapon . . . [but requires only that it] was possessed during the offense."  2008 WL 5978897, at *11.

## ANALYSIS

The United States and Griego stipulate that he is responsible for 140.22 grams of methamphetamine.  Based on the evidence collected in the investigation about his involvement in the Aispuro DTO and the findings of fact in the PSR, the Court concludes 140.22 grams is the quantity of drugs which was reasonably foreseeable to Griego in the scope of his agreement with his co-conspirators, and the Court will thus sustain the parties' objection to the 19.278 kilograms of methamphetamine attributed to him in the PSR.  The PSR applies § 2D1.1(b)(1)'s 2-level enhancement for possession of a dangerous weapon during the offense by Griego based upon firearms found in a Ford Bronco parked at Griego's that had been left there by Aispuro.  Because, in addition to the firearms, the officers found a small amount of drugs inside Griego's house, the Court finds, by a preponderance of the evidence, that the firearms were possessed in

connection with the conspiracy.   Additionally, because Aispuro stowed the weapons in the Bronco, Griego knew that Aispuro did so, and because Aispuro was the leader of the drug trafficking conspiracy, application of § 2D1.1(b)(1)'s 2-level enhancement to Griego can be based on Aispuro's possession of the firearms in the Bronco.   Because Griego has not provided an explanation how Aispuro's possession of the firearms was legitimate and unrelated to the drug trafficking conspiracy, however, he cannot meet his burden to prove that it is clearly improbable any possession by him of the firearms found in the Bronco was in connection with the offense. The Court, therefore, will overrule the parties' objection to the PSR's application of § 2D1.1(b)(1)'s 2-level enhancement for a dangerous weapon possessed in connection with the offense.   Finally, because the evidence supports the parties' stipulation that Griego's participation in any criminal activity was between that of a minimal and a minor participant, the Court will accept the stipulation to the 3-level downward adjustment pursuant to U.S.S.G. § 3B1.2.

**I.   THE COURT WILL SUSTAIN THE PARTIES' OBJECTION TO THE PSR'S FINDING THAT GRIEGO IS RESPONSIBLE FOR 19.278 KILOGRAMS OF METHAMPHETAMINE, RATHER THAN THE PARTIES' STIPULATION TO 140.22 GRAMS IN THEIR BRIEFING ON THEIR OBJECTIONS, BECAUSE THE EVIDENCE SUPPORTS FINDING THAT 140.22 GRAMS IS THE QUANTITY OF DRUGS WHICH WAS REASONABLY FORESEEABLE TO GRIEGO.**

"The quantum of proof necessary to support a drug quantity determination is a preponderance of the evidence. In carrying its burden, the government is not limited in its proof to only those drugs the defendant personally handled or with which he was personally involved." United States v. Ruiz-Castro, 92 F.3d at 1534.   "Under the Guidelines each conspirator, for sentencing purposes, is to be judged not on the distribution made by the entire conspiracy but on

the basis of the quantity of drugs which he reasonably foresaw or which fell within the scope of his particular agreement with the conspirators." United States v. Roberts, 14 F.3d at 522. Thus, in United States v. Hall, the Tenth Circuit upheld the amount of drugs attributed to a co-conspirator defendant, where the amount was determined based on "the Governments' [sic] wiretap evidence in which [the Defendant] places various orders for crack-cocaine or powdered cocaine with [the leader of the drug trafficking organization]." 473 F.3d at 1312.

Both the United States and Griego have stipulated in the briefing of their objections to the PSR that 140.22 grams of methamphetamine is attributable to him for the scope of his participation in the conspiracy. Notably the USPO now agrees that the facts which evidence Griego's particular agreement with his conspirators supports the amount:

> The [] [United States] provided transcriptions of 58 recorded telephone calls between Griego and Javier Aispuro which they deemed "pertinent." Within these transcripts, parties have identified four telephone conversations in which they have been able to identify Griego and Aispuro conducting drug transactions . . . . Based upon these recordings, it can be construed that Griego was directly responsible for approximately 140.22 grams of methamphetamine. Based upon this new information which was not previously made available in discovery, the United States Probation Office can establish a quantitative amount of methamphetamine directly attributable to the defendant . . . . Although this conduct is not necessarily all inclusive, it is what is best known, as to Griego's factual involvement in the conspiracy. Therefore, the [USPO] concurs that Griego's base offense level should be reduced to an offense level of 26.

Third Addendum at 1-2. The United States' wire-tapped recordings of Griego's conversations with Aispuro as evidence of 140.22 grams of methamphetamine being attributable to Griego makes this case analogous to United States v. Hall, in which the Tenth Circuit upheld the district court's attributing the amount of drugs to the defendant based upon the United States' wire-tapped recordings. The Court thus finds that, in light of the evidence of Griego's involvement in the Aispuro DTO drug trafficking conspiracy, the United States could likely prove, by a

preponderance of the evidence, that the amount of drugs that Griego reasonably foresaw or which fell within the scope of his particular agreement with the conspirators is 140.22 grams of methamphetamine. The Court, therefore, sustains the parties' objection to the PSR's attribution of 19.278 kilograms of methamphetamine to Griego, and finds that, pursuant to U.S.S.G. § 2D1.1(c)(7), Griego's corresponding total offense level is 26.

II.  **THE COURT WILL OVERRULE THE PARTIES' OBJECTION TO U.S.S.G. § 2D1.1(b)(1)'S 2-LEVEL ENHANCEMENT FOR POSSESSION OF A FIREARM DURING THE OFFENSE, BECAUSE GRIEGO HAS NOT PROVEN IT CLEARLY IMPROBABLE THAT AISPURO'S POSSESSION OF THE FIREARMS WAS CONNECTED TO THE OFFENSE.**

Section 2D1.1(b)(1) of the Sentencing Guidelines provides: "If a dangerous weapon (including a firearm) was possessed, increase [the base offense level] by **2** levels." U.S.S.G. § 2D1.1(b)(1). The burden is first on the United States to prove, by a preponderance of the evidence, that § 2D1.1(b)(1) applies, because a weapon "was possessed." Once the United States has met its burden, the burden then shifts to the defendant, who must prove that it is clearly improbable the weapon was possessed in connection with the conspiracy. See United States v. Humphrey, 208 F.3d at 1210 ("After the government has met [its] burden, a defendant can still avoid the enhancement if [the defendant] can prove that it is clearly improbable that the weapon was connected to the offense."); United States v. Zavalza-Rodriguez, 379 F.3d at 1187 ("[F]or purposes of § 2D1.1(b)(1), once the government has met its initial burden of showing that a weapon 'was possessed,' the defendant must then show that it is clearly improbable that a weapon was not connected to the offense.").

A.  **THE PREPONDERANCE OF THE EVIDENCE SHOWS THAT GRIEGO POSSESSED THE FIREARMS FOR WHICH THE PSR APPLIES THE 2-LEVEL ENHANCEMENT TO GRIEGO'S OFFENSE LEVEL AS THAT TERM HAS BEEN CONSTRUED UNDER THE SENTENCING GUIDELINES.**

The enhancement is expressed in the passive voice, and Application Note 11 to the Guidelines specifies that "[t]he adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."  U.S.S.G. § 2D1.1, cmt. n.11(A).  The Tenth Circuit requires that, for the 2-level enhancement to apply, "[t]he government must show by a preponderance of the evidence that 'a temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant . . . .'"  United States v. Sallis, 533 F.3d at 1225.  To show that this temporal and spatial relationship exists, the United States "need only show that the weapon was found in the same location where drugs or drug paraphernalia are stored," United States v. Zavalza-Rodriguez, 379 F.3d at 1186-87, or "that the weapon was located nearby the general location where drugs or drug paraphernalia are stored or where part of the transaction occurred," United States v. Flores, 149 F.3d at 1280.  In the context of drug trafficking conspiracies, § 2D1.1(b)(1) applies even if it was the defendant's co-conspirator who actually possessed the dangerous weapon if the co-conspirator's possession was reasonably foreseeable to the defendant.  See United States v. Goree, 2011 WL 5223028, at *10 ("[A] sentencing court may 'attribute to a defendant weapons possessed by his codefendants if the possession of weapons was known to the defendant or reasonably foreseeable by him.'")(quoting United States v. Smith, 131 F.3d at 1400).

### 1.     The Preponderance of the Evidence Shows that Griego Possessed the Firearms Found in the Bronco at His Home.

While the Court is not persuaded that Griego possessed the firearms found in the Bronco parked at the home that he was renting in connection with the offense, as that proposition may be used in a lay sense or in legal contexts outside of the Sentencing Guidelines' framework, the

Court believes that Tenth Circuit precedent counsel the conclusion that a preponderance of the evidence establishes that, for purposes of § 2D1.1(b)(1), Griego possessed a dangerous weapon. The Tenth Circuit, in United States v. Zavalza-Rodriguez, 379 F.3d at 1186-87, contrasted § 2D1.1(b)(1) -- "[i]f a dangerous weapon (including a firearm) was possessed . . . ." U.S.S.G. § 2D1.1(b)(1) -- with § 5C1.2(a)(2) -- "the defendant did not . . . possess a firearm or other dangerous weapon . . . in connection with the offense," U.S.S.G. § 5C1.2(a)(2) -- to conclude that they are distinguishable. The Tenth Circuit concluded that "the government need only show that the weapon was found in the same location where drugs or paraphernalia are stored . . . . Possession in the context of § 2D1.1(b)(1) is therefore possession by proximity -- constructive possession." 379 F.3d at 1186-87. Possession in § 5C1.2 (a)(2), the Tenth Circuit concluded, "is an active possession whereby there is a close connection linking the individual defendant, the weapon and the offense. . . . requiring . . . that a closer degree of connection is necessary [for § 5C1.2(a)(2)] . . . than is necessary for a finding of possession under § 2D1.1(b)(1)." 379 F.3d at 1187. The implication of this discussion is, therefore, that § 2D1.1(b)(1) does not require evidence that the weapon was connected to the offense for § 2D1.1(b)(1) to apply, but rather evidence only that the defendant possessed the weapon in a somewhat close temporal or spatial proximity to the offense. Accord Haines et al., supra, at 546 ("That the gun was possessed for a reason other than facilitating a drug offense does not preclude the enhancement.").

In the context of analyzing whether the United States has met its burden to prove that Griego possessed a dangerous weapon, it, at first blush, appears counter-intuitive at best, and unfair at worst, to impose a 2-level enhancement to the offense level for mere possession of a dangerous weapon in proximity to a criminal offense. Safety and policy considerations support

the enhancement, however, as it gives effect to the United States Sentencing Commission's recognition that a dangerous weapon, such as a firearm, being in mere proximity to a crime increases the possibility and danger that the crime will include violence.  See U.S.S.G. § 2D1.1, cmt. n.11(A) ("The enhancement for weapon possession in subsection (b)(1) reflects the increased danger of violence when drug traffickers possess weapons.").  Moreover, because application of § 2D1.1(b)(1) requires the United States to show some level of both spatial and temporal proximity -- between the weapon, the defendant, and the drugs -- to meet its burden, its application is neither arbitrary nor without limits.  Although the Court cannot find case law in which the United States has failed to meet its burden to show proximity under § 2D1.1(b)(1), the Court can hypothesize situations in which a weapon fails the proximity test, such as where the weapon is a hunting rifle stored at the defendant's hunting cabin.  In situations that are not as clear cut as this hypothetical, where it might nevertheless be inappropriate to apply a 2-level enhancement for a defendant's possession of a dangerous weapon because the defendant's possession of the weapon was not in any way connected to the drug trafficking offense, § 2D1.1(b)(1) has a mechanism in place to prevent its applications in such situations, as the defendant can show that it is clearly improbable that the weapon was connected to the offense. See, e.g., United States v. Humphrey, 208 F.3d at 1210 ("After the government has met [its] burden, a defendant can still avoid the enhancement if [the defendant] can prove that it is clearly improbable that the weapon was connected to the offense.").  Thus, while the application of § 2D1.1(b)(1)'s 2-level enhancement might seem harsh or even unfair in light of the low bar required to meet the initial burden of showing a weapon was possessed by the defendant, some quantum of proof connecting the weapon and the offense may ultimately be required.  There is a

mechanism in place for the defendant to affirmatively disprove that his or her possession of the weapon was connected to the offense. The reality that the presence of a dangerous weapon makes drug transactions more dangerous also supports the 2-level enhancement. Accordingly, the enhancement's low threshold burden is rational.

The conclusion that a sufficient "temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant," United States v. Sallis, 533 F.3d at 1225, in this case for § 2D1.1(b)(1)'s application may be tenuous. Nevertheless, because the Court cannot soundly distinguish its analysis of this case and the Tenth Circuit's analysis and holding in United States v. Hall, the Court concludes that a preponderance of the evidence shows such a relation existed here. In United States v. Hall, the Tenth Circuit held that the United States met its burden under § 2D1.1(b)(1) to prove, by a preponderance of the evidence, that a dangerous weapon was possessed by the defendant -- one of twenty-seven co-defendants in a cocaine trafficking conspiracy -- where an unloaded gun was found in a car sitting outside the defendant's home and "other drug paraphernalia was found at the house, including scales with cocaine residue on them." 473 F.3d at 1312. Officers found "an unloaded shotgun and various ammunition (but no shotgun shells) . . . during the execution of a search warrant at [the defendant]'s residence." 473 F.3d at 1303. "The ammunition was discovered inside [the defendant]'s house, while the shotgun was discovered in an inoperable car parked outside his residence." 473 F.3d at 1303. The defendant

> contended that the Government could not link [the defendant] to the shotgun because it was seized from an abandoned car while [he] was asleep in his bedroom; there were no fingerprints on the gun; there was no evidence that drug-dealing ever went on in his home; no shotgun shells were discovered during the search; and the search was executed approximately a week after the last date of the conspiracy alleged by the Government. [The defendant] also notes that he was not charged with a firearms offense.

473 F.3d at 1303-04.  The Tenth Circuit concluded, however, that the United States had met its

burden, because "[e]vidence that the weapon was found in a location where drugs or drug

paraphernalia is stored establishes the necessary showing."  473 F.3d at 1312.  The Tenth Circuit

noted:

> Though the shotgun was found in an abandoned car, the gun itself was oiled,
> cleaned, and spotless.  It was sitting on top of other items in the car and it was
> easily accessible to Mr. Hall because the car, a T-top, was right outside the
> backdoor and one could grab the gun simply by reaching down through the roof
> of the car.  Furthermore, the video surveillance and wiretaps revealed that Mr.
> Hall frequently returned to his residence immediately after negotiating drug
> transactions over the phone with Mr. Small.  The Government also pointed out
> that in addition to the weapons-related evidence, the police recovered other "tools
> of the trade" in their search—namely, $2,700 in cash and two scales that were
> found to have residue of cocaine on them.

United States v. Hall, 473 F.3d at 1304.

The firearms attributed to Griego in this case, like the shotgun underlying the §

2D1.1(b)(1) applications in United States v. Hall, were found in a car at Griego's residence.  As

the Tenth Circuit in United States v. Hall noted that other "tools of the trade" were found in their

search of the defendant's home  similarly here, small amounts of marijuana, cocaine, and

methamphetamine were found at Griego's home.  Although no information was disclosed in

discovery regarding the amounts of those substances, that they were field tested and found to

exist suggests that they were at least trace amounts, if not greater.  While Griego contends, and

the United States does not dispute, that Aispuro left the guns and ammunition found in the

Bronco at Griego's home, it appears that the lack of evidence linking the gun to the defendant in

United States v. Hall did not weigh greatly in the Tenth Circuit's conclusion that the United

States had met its burden.  While there was no mention of affirmative evidence that the gun in

United States v. Hall could have or did belong to a co-conspirator, such evidence would likely go to the defendant's burden of proving that it was clearly improbable the weapon was connected with the offense.  Moreover, because Aispuro is Griego's co-conspirator, and because the "Guidelines provision authorizes the increase in offense level even if the gun was actually possessed only by [a co-conspirator] . . . [,]" United States v. Humphrey, 208 F.3d at 1210, whether the firearms were Aispuro's, rather than Griego's would likely not matter in regards to the issue of possession.  See United States v. Humphrey, 208 F.3d at 1211 (holding that, because of close relationship between two co-conspirators, the weapon found in the co-conspirator's car was possessed by the defendant under § 2D1.1(b)(1) even "in the absence of evidence that [the defendant] had actual knowledge of the gun").

On the other hand, there are grounds on which to distinguish this case from United States v. Hall.  Whereas in United States v. Hall, there was video evidence that the defendant "frequently returned to his residence immediately after negotiating drug transactions," there is no such evidence here.  The record lacks evidence that Griego's house was involved in the drug trafficking conspiracy.  Cf. United States v. Hernandez-Mejia, 2008 WL 5978897, at *9 (concluding that 2-level enhancement applied where a gun was found on the floor in the defendant's house, which "trial evidence indicated . . . was the center of the financial activity underpinning the conspiracy").  While the parties may reasonably contend that such evidence cuts against finding that either a spatial or temporal relationship exists between the firearms found in the Bronco and Griego's participation in the drug trafficking activity, United States v. Hall does not support such a contention.  That the record lacks evidence Griego frequently returned to his residence immediately after negotiating drug transactions cannot be a sound basis

on which distinguish this case from United States v. Hall.  Although the evidence may be lacking, it is reasonable to assume that Griego returned to his home after negotiating or conducting drug transactions.  The facts here are also distinguishable as there is no evidence that the officers found scales or cash in the course of searching Griego's home.  Again, however, in light of the expansive construction that courts have given § 2D1.1(b)(1), and because drugs were found during the search of Griego's home, the Court cannot soundly conclude that the weapon was not found in sufficient proximity to drug paraphernalia or drugs to constitute possession as that term is used in § 2D1.1(b)(1).  The Court therefore concludes that a preponderance of the evidence establishes that, under § 2D1.1(b)(1), Griego possessed the dangerous weapons found in the Bronco.

### 2.    A Preponderance of the Evidence Shows that Griego's Co-Conspirator, Aispuro, Possessed the Firearms Found in the Bronco at Griego's Home.

Whether, for purposes of § 2D1.1(b)(1), Griego personally possessed the firearms found in the Bronco, a preponderance of the evidence shows that it was foreseeable by Griego that Aispuro possessed the firearms.  Because Griego was convicted of conspiracy to traffic drugs, because Griego admitted that he knew the guns belonged to Aispuro, he is deemed to have possessed the firearms for purposes of § 2D1.1(b)(1) if Aispuro's "possession of the weapon in connection with the conspiracy was reasonably foreseeable to [Griego]."  United States v. Humphrey, 208 F.3d at 1211.  To meet its burden, the United States must show: (i) that it was reasonably foreseeable to Griego that Aispuro possessed the dangerous weapons; and (ii) that the weapons were possessed for purposes of § 2D1.1(b)(1), i.e., that a temporal and spatial relation

existed between the weapon, the drug trafficking conspiracy, and Aispuro.  See United States v. Sallis, 533 F.3d at 1225.

Although there is no direct evidence that Aispuro possessed methamphetamine or other drugs at the time that he showed up with the guns, or evidence that the trip to Socorro was to distribute drugs, Aispuro's role as the leader of the Aispuro DTO, and the evidence of the Aispuro DTO's trafficking in firearms, is sufficient to meet the United States' low burden to prove that Aispuro possessed the weapons, and therefore, under § 2D1.1(b)(1), Griego possessed the weapons.  In United States v. Humphrey, for example, the Tenth Circuit held that a pistol found in the trunk of a car was sufficient for application of § 2D1.1(b)(1)'s 2-level enhancement even though there were no drugs found in the car, reasoning that there was evidence of drug sales, including drug ledgers in the trunk, and there was sufficient evidence that the firearm was available for past and future sales and purchases of drugs.  See 208 F.3d at 1211.  The Tenth Circuit noted that, in sentencing the defendant, the district court stated that "[i]t stretches credulity . . . to think that this defendant did not know that a loaded gun was available for the purposes of protecting the integrity of their drug purchases and sales."  208 F.3d at 1211 (emphasis added).  The Tenth Circuit also upheld application of the 2-level enhancement to the defendant's co-conspirator based on the weapon found in the car, noting that the co-conspirator had a "longstanding relationship with the defendant," and it was thus foreseeable that defendant "possessed a firearm in relation to the distribution of controlled substances."  208 F.3d at 1211. Here, as in United States v. Humphrey, although the record lacks direct evidence that the firearms were used in connection with the drug trafficking conspiracy, the circumstantial proof regarding the scope of Aispuro's involvement in the conspiracy and the Aispuro DTO's

trafficking in drugs, and the liberal construction that the Tenth Circuit has given that term as used in § 2D1.1(b)(1), counsels the Court to conclude, by a preponderance of the evidence, that the firearms found in the Bronco were available at some point for drug purchases and sales.  Not only was Aispuro involved in the Aispuro DTO -- the drug trafficking conspiracy in which Griego is convicted of having participated -- but Aispuro was the leader of the conspiracy.  See PSR ¶ 23, at 7.  Griego admits in his Brief that he knew Aispuro possessed the guns, and it was at Griego's direction that Aispuro stowed the guns in the Bronco:

> Aispuro [came] to Mr. Griego's home to pick him up and drive him to Socorro, New Mexico, to work on a car alarm.  When Mr. Aispuro arrived at Griego's home, Griego saw the weapons in Aispuro's Chevrolet Tahoe, and refused to be in the vehicle with those weapons.  Mr. Aispuro, therefore, took them out of his own vehicle and stashed them in the Bronco, with the understanding that he would retrieve them when he brought Griego back to his home.

Brief at 4-5.  The Aispuro DTO, in addition to trafficking in drugs, trafficked in weapons, purchasing them with money acquired from drugs and shipping them to associates in Mexico. See PSR ¶ 15, at 5.  While United States v. Humphrey may be distinguished in that there was evidence that linked the vehicle in which the gun was found was to previous drug transactions, while there is no evidence that the Bronco was involved in Griego's or Aispuro's drug trafficking, in light of Aispuro's role in the conspiracy, and the evidence of the extent the conspiracy trafficked in guns, such a distinction is not sufficient for the Court to find that the evidence does not meet the low-level burden of possession as used in § 2D1.1(b)(1).  A preponderance of the evidence therefore shows that, for purposes of § 2D1.1(b)(1), Aispuro possessed the firearms found in the Bronco.  Griego admitted that he often saw Aispuro store guns at the shop and package guns in speaker boxes.  See Plea Agreement ¶ 7, at 4; PSR ¶ 66, at 17.  Griego thus had actual knowledge that Aispuro possessed weapons.  Accordingly, it was

reasonably foreseeable to Griego that Aispuro possessed the dangerous weapons.  Whereas the Tenth Circuit upheld the application of § 2D1.1(b)(1)'s two-level enhancement based on the fact that it was clearly foreseeable to the defendant's co-conspirator that the defendant possessed the weapon "in relation to the distribution of controlled substances," 208 F.3d at 1211, that Griego admits that he saw Aispuro store guns at the shop and pack them in speakers showed up at his house with the firearms, that the Aispuro DTO trafficked guns to Mexico as part of its operation, and Griego's knowledge that Aispuro was leader of the Aispuro DTO, leads the Court to conclude that it was foreseeable to him that Aispuro possessed firearms in relation to the distribution of drugs.   Accord United States v. Goddard, 929 F.2d 546, 548 (10th Cir. 1991)(noting that the 2-level enhancement pursuant to § 2D1.1(b)(1) "may be based on the conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant").

The Court thus concludes that Aispuro possessed the firearms found in the Bronco at Griego's home, and that such possession was foreseeable to Griego.  The United States, therefore, has met its burden to prove that 2D1.1(b)(1)'s 2-level enhancement applies to Griego, unless Griego can prove that it is clearly improbable the firearms found in his Bronco were connected to the offense.

**B.    GRIEGO HAS PROVED IT CLEARLY IMPROBABLE THAT THE FIREARMS FOUND IN HIS BRONCO WERE CONNECTED TO THE DRUG TRAFFICKING CONSPIRACY.**

The Court notes, at the outset, that, although the Aispuro DTO was involved in trafficking weapons to Mexico, the issue before the Court in this Memorandum Opinion and Order is not whether Griego can prove it clearly improbable that he or his co-conspirators never

-33-

possessed a dangerous weapon in connection with the drug trafficking conspiracy, but rather whether he can prove it clearly improbable that the weapons on which the PSR based its 2-level enhancement -- the firearms found in the Bronco on his property -- were connected to the drug trafficking conspiracy.   A preponderance of the evidence shows that Griego possessed the firearms found in the Bronco, that Aispuro possessed the firearms, and that Aispuro's possession of the firearms was foreseeable by Griego.   Griego, to meet his burden to rebut application of § 2D1.1(b)(1)'s 2-level enhancement, must show that it was clearly improbable that either Griego or Aispuro possessed the firearms found in the Bronco in connection with the Aispuro DTO drug trafficking conspiracy.

### 1.    Griego has Proved it Clearly Improbable that the Firearms were Connected to His Involvement in the Conspiracy.

The Court, under the reasoning of United States v. Hall, finds, based primarily on the facts that the firearms were found in a vehicle on Griego's property, and that small amounts of drugs were found in Griego's home, that Griego possessed the firearms for U.S.S.G. § 2D1.1(b)(1)'s purposes.   Such a finding is not the end of the inquiry, however, and does not preclude the Court's finding that additional evidence shows that it is clearly improbable that the weapon was used in connection with the offense.   While the defendant in United States v. Hall asserted that the United States could not prove that the gun was his, because "there were no fingerprints on the gun," 473 F.3d at 1303, there was no explanation as to whom the gun belonged.   Here, both Griego and the United States agree that the Aispuro stowed the particular firearms underlying the 2-level enhancement in the Bronco when Griego refused to ride with Aispuro in his Chevrolet Tahoe while there were guns in the Tahoe, and that he intended to take them upon their return to Griego's home, but had apparently forgotten to do so.   See Brief at 5.

-34-

That he intended to take them is affirmative evidence that Griego's possession of the weapon for § 2D1.1(b)(1)'s purposes is not connected to his involvement in the drug trafficking conspiracy, because it evinces that Aispuro, rather than Griego, possessed the weapons.  It is also evidence that Griego may not have known that the firearms were still in the Bronco, as he might have believed that Aispuro had retrieved them.  More important than the evidence's probative value as to who owned or possessed the firearms -- especially in light of § 2D1.1(b)(1)'s extension of possession for that of a co-conspirator's possession -- however, is that the evidence establishes that it is clearly improbable that Griego possessed the firearms in connection with his involvement in the drug trafficking conspiracy.  The evidence in the case suggests that Griego was unfamiliar with firearms at best, and more likely than not, simply averse to being around them.  Griego refused to ride in a vehicle while there were guns in the car, and accompanied Aispuro on the trip only after he had stowed the firearms in the Bronco.  That Griego refused a ride with Aispuro, who was not only the leader of the Aispuro DTO, but also the owner of the automobile shop that employed Griego, while guns were in Aispuro's Tahoe shows that Griego was more than uncomfortable around guns, but had a very strong aversion to them.  It is also notable that Griego, in his Plea Agreement, admits that Aispuro "left three [] assault rifles and a bullet-proof vest in an abandoned car on my property," but leaves out that, also left in the Bronco, was a hand gun, magazine clips, and other ammunition.  While perhaps an oversight, it may also be evidence of Griego's lack of knowledge and personal familiarity with guns, and with the firearms left in the Bronco specifically.  Additionally, that the officers found the firearms in the place that Aispuro stowed them before they drove to Socorro additionally evidences the clear

improbability that Griego possessed the firearms in connection with his involvement in the conspiracy.

There is no evidence to suggest that the firearms being at Griego's home presented the danger associated with possession of a dangerous weapon in connection with drug trafficking, because the evidence connecting Griego's home with the drug trafficking conspiracy is not commensurate the locations' connections to the conspiracy in precedent cases. There is no evidence that Griego's home, where the Bronco was abandoned, was used to traffic drugs, was a financial center for the conspiracy, or in any way connected with the Aispuro DTO's drug trafficking activities. Griego's case is thus distinguished from United States v. Hernandez-Mejia, in which the Court applied the 2-level enhancement, because "the house in which the gun was discovered ha[d] several connections to the drug trafficking conspiracy. . . ." 2008 WL 5978897, at *9 (emphasis added). While there is evidence that the officers found "very small" amounts of methamphetamine at Griego's house, PSR ¶ 45, at 12, unlike United States v. Hernandez-Mejia, where the gun was found lying on the floor in a bedroom, the firearms were not found inside Griego's house. Additionally, the very small amount of methamphetamine and cocaine found in Griego's house is as consistent with his admitted use of drugs, rather than with distribution, if not more so. Taken in the aggregate, this evidence establishes, by a preponderance of the evidence, that it is clearly improbable that a connection existed between the firearms found in the Bronco at Griego's home, on which the PSR based its 2-level enhancement pursuant to § 2D1.1(b)(1), and Griego's involvement in the drug trafficking conspiracy for which he was convicted.

## 2.      Griego has Not Proved it Clearly Improbable that the Firearms were Connected to Aispuro's Involvement in the Conspiracy.

Aispuro possessed the firearms at issue here based on the undisputed evidence of his actual possession of them in his Tahoe, and, because of Aispuro's role in the Aispuro DTO and the Aispuro DTO's trafficking in weapons, the inference that a sufficient proximity of the weapons to the offense exists.  The only evidence in the case as to the particular firearms found in the Bronco, the firearms for which the PSR applies U.S.S.G. § 2D1.1(b)(1)'s enhancement to Griego, is that Aispuro stored them in the Bronco in the course of a trip unrelated to the drug trafficking conspiracy, and that the firearms were recovered from the same place two weeks later by the officers.  Notably, the record lacks evidence specifically placing these particular firearms to the drug trafficking conspiracy.

Co-conspirator liability for purposes of § 2D1.1(b)(1)'s two-level sentencing enhancement is predicated upon the theory that, because sentencing is based upon all relevant conduct under U.S.S.G. § 1B1.3 -- as opposed to only the conduct of the crime for which the defendant is convicted -- the 2-level enhancement pursuant to § 2D1.1(b)(1) "may be based on the conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant."  United States v. Goddard, 929 F.2d at 548. Aispuro's actual possession of the weapons in his Tahoe when he picked up Griego for conduct unrelated to any criminal activity is as far as the evidence goes linking Aispuro's possession of the particular weapons to any of either Aispuro's or Griego's conduct.  The lack of evidence regarding any connection between the firearms found in the Bronco and drug trafficking activity, and that Aispuro brought the firearms along on a trip, the purpose of which was unrelated to the drug trafficking conspiracy, on the one hand, distinguishes Aispuro's possession of the firearms

here from the precedent upholding § 2D1.1(b)(1)'s 2-level enhancement.  Whereas there was eyewitness testimony in United States v. Humphrey that the vehicle in which the drugs were found had been used to transport methamphetamine, there is no evidence that either the Bronco or the Tahoe was used in connection with the transport of methamphetamine or that any of the conspirators used the Bronco.  The Bronco had been sitting on the property that Griego rents since Griego moved in, and he believes that it was abandoned there by a relative of the property owner.  The record thus lacks evidence showing that the firearms found in the Bronco were accessible to Aispuro in connection with his involvement in drug trafficking activity.

United States v. Humphreys, like the majority of the case law discussing § 2D1.1(b)(1)'s enhancement, analyzes whether a preponderance of the evidence shows that the nexus between the weapons and the drug trafficking activity exists.  Whether the defendant met her burden to show that it was clearly improbable that the weapon was connected with the conspiracy offense was not at issue.  United States v. Humphreys, 208 F.3d at 1211 ("The government's evidence was sufficient to meet its burden, and Humphrey introduced no evidence to show that it was improbable that the gun was connected to the conspiracy.")  In light the policy behind § 2D1.1(b)(1)'s application, and the Aispuro DTO's drug trafficking and weapon trafficking activities, the Court cannot find it clearly improbable that Aispuro's possession of the firearms was not connected with the drug trafficking conspiracy.

First, § 2D1.1(b)(1)'s 2-level enhancement is not applicable where the defendant is convicted of using or carrying a firearm in relation to a drug trafficking offense, as such conduct is governed by guideline section 2K2.4.  See U.S.S.G. § 2K2.4(b) (providing the guidelines sentence for "Use of Firearm . . . in Relation to Certain Crimes," including where a defendant is

convicted of using a weapon in connection with a drug trafficking conspiracy under 21 U.S.C. § 924(c)). Application Note 4 to § 2K2.4 provides: "A sentence under this guideline accounts for any . . . weapons enhancement for the underlying offense of a conviction, including any such enhancement that would be based on conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct)."  U.S.S.G. § 2K2.4, cmt. n.4.  Thus, § 2D1.1(b)(1)'s enhancement is designed to punish the defendant for a weapon that he or she "possesses" merely because of the increased danger of violence associated with drug traffickers' possession of weapons.  See U.S.S.G. § 2D1.1, cmt. n.11(A)("The enhancement for weapon possession in subsection (b)(1) reflects the increased danger of violence when drug traffickers possess weapons.").

Second, it is telling that, when presented with a lack of evidence regarding weapons' connection with the drug trafficking conspiracy, courts have concluded that the lack of evidence weighs against the United States in failing to meet its burden of establishing the requisite nexus, rather than concluding that the lack of evidence shows that possession of the weapon was clearly improbably related to the offense.  See United States v. Stallings, 463 F.3d 1218, 1221 (11th Cir. 2006)("Here, because the government provided no evidence connecting the pistols found in Johnson's home to his alleged drug activity and because the government never addressed the possibility that the weapons belonged to any of the other adults residing in his home, the government has failed to meet its burden."); United States v. Cooper, 111 F.3d 845, 546-47 (11th Cir. 1997)(holding that § 2D1.1(b)(1)'s application based on "weapons [] found with other offense-related items at [the defendant's] home" was clear error where "the government did not establish that the weapons were present at the mini-warehouse, the site of the charged conduct"); United States v. Shields, 44 F.3d 673, 674-75 (8th Cir. 1995)(overturning the district court's

application of the § 2D1.1(b)(1) enhancement as clear error, "[b]ecause the government presented no evidence regarding the presence of the weapons and their nexus to the drug crimes . . . ."). The Court has already determined that, based on the Aispuro DTO's substantial trafficking in weapons in connection with its drug trafficking, a preponderance of the evidence shows Aispuro's possession of the weapons was in connection with the drug trafficking conspiracy. Any assertion that the United States has not put forth sufficient evidence here connecting Aispuro's possession of the guns found in the Bronco to his drug trafficking activity does not therefore appear probative whether Griego has met his burden to establish that it is clearly improbable Aispuro's possession of the weapons was clearly unrelated to his drug trafficking activities. Such an assertion would, rather, shift the burden to the United States, requiring it to prove that the possession was <u>clearly</u> related to the drug trafficking activities. Imposing that burden on the United States is contrary to both the Sentencing Guidelines and the precedent case law interpreting the guidelines. <u>See</u> U.S.S.G. § 2D1.1, cmt. n.11(A) ("The enhancement should be applied . . . unless it is clearly improbable that the weapon was connected with the offense."); <u>United States v. Humphrey</u>, 208 F.3d at 1210 ("[A] defendant can still avoid the enhancement if [the defendant] can prove that it is clearly improbable that the weapon was connected to the offense.").

The United States Sentencing Commission's commentary and two cases -- one from the United States Court of Appeals for the Sixth Circuit and one from the Tenth Circuit -- demonstrate that the clearly improbable burden is not easily met. The Sentencing Commission, at Application Note 11(A), provides an example of a situation in which the defendant can demonstrate it clearly improbable that possession of a firearm is connected to a drug trafficking

offense.   Application Note 11(A) states: "[T]he enhancement would not be applied if the defendant, arrested at the defendant's residence, had an unloaded hunting rifle in the closet." U.S.S.G. § 2D1.1, cmt. n.11(A).  The Sixth Circuit's opinion in United States v. Zimmer, 14 F.3d 286 (6th Cir. 1994), provides a good illustration of this example.   In United States v. Zimmer, the Sixth Circuit determined that the district court's application of § 2D1.1(b)(1)'s enhancement was clear error, concluding that the defendant met his burden by "show[ing] by unrefuted testimony that the[] rifles were for hunting and were unconnected with the marijuana." 14 F.3d at 290.   The Sixth Circuit noted that the defendant was convicted for "a marijuana manufacturing operation," and that "[t]here are no allegations that Zimmer was actively selling the substance . . . ."  14 F.3d at 291.   Regarding the weapons for which the enhancement was applied, the Sixth Circuit explained:

> The rifles were found in the main part of the house while the plants were grown in a "secret room" in the basement. No weapons were found in the basement where the marijuana plants were located. Two rifles (one operable but unloaded, one disassembled and inoperable) were in the living room while one rifle was found loaded in the bathroom.  Zimmer stated that only the rifle in the bathroom belonged to him and that he used it to hunt, which was clearly supported by the fact that Zimmer had killed a deer from the bathroom window on the day before the search (he was fined for illegal possession of the deer).

United States v. Zimmer, 14 F.3d at 291.  The Sixth Circuit concluded Zimmer's assertions about all three rifles being unconnected with his marijuana manufacturing were supported by substantial evidence:

> That one of the rifles in the living room was disassembled and inoperable supports the defendant's claim that he was repairing it for a friend.  Likewise, the absence of any ammunition in the house for the unloaded second rifle further supports the defendant's assertion that the rifle did not belong to him.
>
> As for the loaded rifle, Zimmer's claim that he used it for hunting purposes was factually corroborated.  Zimmer argued that he hunted from the window of his bathroom which faced the back of his yard.  At least one deer

found on the premises had been shot from the window the day before. This testimony was unrebutted by the government. Moreover, the bathroom was in the main part of the house and not near the basement where the marijuana was located.

14 F.3d at 291.

In United States v. Krolopp, 427 F. App'x 639, 642-43 (10th Cir. 2011) (unpublished), on the other hand, the Tenth Circuit concluded that the defendant failed to show it was clearly improbable that his possession of a "100 year[] old" shotgun was connected to the drug offense, based primarily on the way in which the defendant stored the gun and the lack of a compelling reason to believe that it was not connected. 427 F. App'x at 643. Where the defendant argued that he kept the shotgun as a collector's item, and that the gun was functional and had its stock wrapped in electrical tape "suggest[ed] a utilitarian rather than a decorative function, and [that] it had little value as a collector's item." 427 F. App'x at 643. There were other collector's weapons at the home, and the defendant argued that, because he concealed black gun powder, "which was quite clearly a collectible," his concealment of the shotgun was not inconsistent with it being a collector's item. 427 F. App'x at 643. The Tenth Circuit also rejected the defendant's argument that the lack of ammunition showed that it was clearly improbably connected to the drug trafficking, stating that "[t]his factor is not determinative." 427 F. App'x at 643.

Although the evidence about Aispuro's possession of the firearms on which the PSR's 2-level enhancement is sparse, Griego has not presented any evidence on which the Court could soundly conclude that Aispuro's possession of the firearms found in the Bronco was clearly unrelated to the Aispuro drug trafficking conspiracy. The firearms found in the Bronco were not hunting rifles, distinguishing this case from the hunting rifle that the defendant possessed in United States v. Zimmer and the example provided by the Sentencing Commission. Also, in

United States v. Zimmer, the Sixth Circuit concluded that the lack of ammunition for one of the rifles and the other being in separate pieces was consistent with the defendant's assertion that he was fixing the rifles, and there was a legitimate reason for possessing the weapons, and that evidence supported that assertion.  Here, on the other hand, Griego has provided no explanation for what legitimate use Aispuro may have had for his possession of the three assault rifles or the handgun.  Based on the character of the weapons, that four of them were found together, and the uncontroverted evidence of the Aispuro DTO's gun-trafficking activities, it is not likely that Griego could have provided an explanation about a legitimate reason for Aispuro's possession of the weapons.  The lack of any affirmative explanation distinguishes this case from United States v. Krolopp, where, even faced with a defendant possessing a 100-year-old shotgun in a house with other collectible weapons, the Tenth Circuit nevertheless concluded that the defendant did not meet his burden.  Moreover, found in the Bronco alongside the three assault rifles and the handgun were bullets and body armor.  Although the record does not reflect whether the guns were loaded at the time the officers discovered them, given that the Tenth Circuit concluded that a complete lack of ammunition was "not dispositive" whether the gun was clearly improbably connected to drug trafficking in United States v. Krolopp, that there was ammunition found alongside the guns here provides a stronger basis to conclude that Griego has failed to meet his burden.  In light of the Aispuro DTO's gun trafficking in connection with it drug trafficking activities, without an explanation how Aispuro's possession of three assault rifles, one handgun, body armor, and magazines of ammunition is unrelated to the Aispuro drug trafficking conspiracy, the Court cannot soundly conclude that Griego has met his burden to show that Aispuro's possession is clearly unrelated to his drug trafficking activity.

The Court therefore finds that, under the facts and circumstances of the case, Aispuro possessed the firearms found in the Bronco in connection with the drug offense for which Griego was convicted, that possession was foreseeable by Griego, and Griego has failed to show that it was clearly improbable Aispuro's possession of the firearms was related to the drug trafficking conspiracy.   The Court, therefore, will overrule the parties' second objection to the USPO's attribution of the firearms to Griego and the corresponding 2-level enhancement in the PSR.[5]

### III.    IN THE SCOPE OF THE AISPURO DTO, GRIEGO'S ROLE WAS THAT OF A MINIMAL/MINOR PARTICIPANT, BECAUSE, WHILE HE IS LESS CULPABLE THAN THE AVERAGE PARTICIPANT, HE IS NOT PLAINLY AMONG THE LEAST CULPABLE OF THOSE INVOLVED IN THE CONDUCT OF ORGANIZATION.

The Court accepts the parties' stipulation as to minor/minimal role adjustment.  U.S.S.G. § 3B1.2 provides:

Based on the defendant's role in the offense, decrease the offense level as follows:

(a)    if the defendant was a minimal participant in any criminal activity, decrease by **4** levels.

(b)    If the defendant was a minor participant in any criminal activity, decrease by **2** levels.

In cases falling between (a) and (b), decrease by **3** levels.

U.S.S.G. § 3B1.2.  The application notes state that the minor participant reduction applies to a "defendant  . . . who is less culpable than most other participants, but whose role could not be

---

[5] Although the Court finds that § 2D1.1(b)(2)'s enhancement applies to Griego, because Aispuro's possession of the firearms in connection with the Aispuro DTO's drug trafficking activities was foreseeable, Griego's affirmative refusal to possess the guns may counsel in favor of a downward variance, perhaps commensurate with the 2-level enhancement at sentencing. That Griego would not ride along with Aispuro to Socorro while Aispuro had firearms in the car evinces that Griego did not actually possess the firearms and that he very likely had a general aversion to firearms.  Beyond that, his actions might have prevented the further use of the firearms by the Aispuro DTO, or others, in connection with the drug trafficking activities in the time intervening between the trip to Socorro and the officers' search of Griego's residence, and perhaps after that time.

described as minimal," U.S.S.G. § 3B1.2, cmt. n.5, and the minimal participant reduction applies to "defendants who are plainly among the least culpable of those involved in the conduct of a group," U.S.S.G. § 3B1.2, cmt. n.4.  Based on the Aispuro DTO's drug trafficking conspiracy -- the criminal activity for which Griego was arrested -- it appears that, in terms of the conspiracy to traffic drugs and weapons, the scope of Griego's involvement was less culpable than most other participants, because, while the evidence suggests that the Aispuro DTO distributed up to or more than fifty pounds of methamphetamine per week, during the four-months that the FBI investigated the conspiracy, Griego is responsible for distributing 140.22 grams only. Additionally, Aispuro and Armstrong employed Griego at the car shop that they owned to install car stereo systems and car alarms.  Because the evidence suggests that he met Aispuro via employment working on cars at another shop before going to work for Aispuro and Armstrong, it appears that he was employed to work on cars and not to traffic in drugs.  The parties do not contend that Griego is entitled to a 4-level adjustment for being a minimal participant, and the evidence does not appear to support such a role.  The PSR notes that Griego sold drugs directly for Aispuro and Anderson, where others did not do so directly, and was one of the only co-conspirators that had interactions directly with Aispuro.  See PSR ¶ 42, at 11.  It is thus not clear that Griego is plainly among the least culpable participants, but rather appears as though Griego's role fell in between that of a minimal and a minor participant in any criminal activity. The Court will thus accept the parties' stipulation that Griego was a minimal/minor participant. After a 3-level decrease for Griego's minimal/minor role in the offense pursuant to U.S.S.G. § 3B1.2, Griego's offense level is 23.

**IT IS ORDERED** that the objections raised in the Parties' *Sealed* Joint Objections to the Presentence Report, filed Apr. 26, 2012 (Doc. 510), and supported in the Brief Supporting Objections to the Presentence Report, filed Sept. 12, 2012 (Doc. 550), are sustained.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Kenneth J.  Gonzales
  United States Attorney
Joel R. Meyers
Cynthia L. Weisman
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

  *Attorneys for the Plaintiff*

D. Eric Hannum
Albuquerque, New Mexico

  *Attorney for the Defendant*